[Civ. No. 5833.  First Appellate District, Division Two.—April 4, 1927.]

F. E. BOOTH, Respondent, v. HELEN E. FRIEDMAN, as Executrix, etc., et al., Appellants.

[1] EVIDENCE — ACTION ON CLAIM AGAINST ESTATE — INCOMPETENT WITNESS—WAIVER OF OBJECTION.—In an action on a claim against an estate, where the defendant interposes an objection to the testimony of the plaintiff and the witness is withdrawn, but subsequently, and after defendant has called certain witnesses and offers proof of statements made by plaintiff inconsistent with the theory of plaintiff's case, plaintiff is called in rebuttal and gives testimony as to matters occurring prior to the death of the decedent, and defendant does not object to such testimony, nor make any motion to strike it out, but proceeds to cross-examine the witness, the testimony thus given must be considered on appeal in determining the sufficiency of the evidence to justify the findings.

[2] GUARANTY—SEVERAL GUARANTORS—PRO RATA LIABILITY.—Where three stockholders of a corporation jointly guarantee the payment of the indebtedness of the corporation to a certain bank, said guarantors, as between themselves, and nothing to the contrary appearing, are each liable for one-third of the obligation.

[3] ID.—RENEWAL OF GUARANTY—LIABILITY OF PARTIES.—Where, in renewing the said guaranty, one of the stockholders requests that he be not required to sign, but he acknowledges his liability and agrees to pay his *pro rata* whenever the stockholder signing shall become liable to the bank, said stockholder not signing impliedly waives his right to participate in settling the guaranteed account with the bank, and the stockholder signing, as the sole maker, upon demand of the bank, is bound to meet the obligation of the guaranty.

[4] ID.—ORAL AGREEMENT TO PAY PRO RATA—ACCRUAL OF LIABILITY.—Where said stockholder not signing agreed to bear his burden and that his liability should be the same as if his name was on the guaranty, a cause of action against him for his *pro rata* arose upon the payment of the obligation by the stockholder signing same, in the absence of an agreement providing otherwise.

[5] ID.—STATUTE OF FRAUDS—CONSTRUCTION OF FINDINGS—APPEAL.—Findings should be so construed, on appeal, as to give the judg-

4. Contribution between stockholders as sureties for corporation, note, **Ann. Cas.** 1916B, 361. Contribution between sureties,. 10 **Am. St. Rep.** 639. See, also, 6 *Cal. Jur.* 504; 12 *R. C. L.* 1099.

5. See 2 *Cal. Jur.* 871.

ment force and effect, if possible; and the appellate court will not reverse a judgment merely because an oral agreement set forth in the pleadings may be so construed as to bring it within the statute of frauds and thus render the judgment unsupported by the findings and evidence.

(1) 4 C. J., p. 679, n. 42.   (2) 28 C. J., p. 1039, n. 19.   (5) 38 Cyc., p. 1966, n. 86.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Frank J. Murasky, Judge. Affirmed.

The facts are stated in the opinion of the court.

Byrne & Lamson for Appellants.

J. H. Morris for Respondent.

STURTEVANT, J.—Claiming that M. S. Eisner, deceased, was at the time of his death under obligation to pay the plaintiff certain moneys, the plaintiff commenced this action against the defendants as executors of the estate of the deceased. The trial court made findings in favor of the plaintiff and a judgment in accordance with those findings was entered. From that judgment the defendants have appealed and have brought up a bill of exceptions. On the appeal the appellants attack certain findings as not being supported by the evidence. Before taking up a consideration of those attacks it is necessary to recite some of the facts.

Prior to the year 1920 the Novelty Products Company, a corporation, had been engaged in the manufacture of toys. It had a paid-up capital of $100,000. B. D. M. Greene was president and manager. Under his solicitation $2,500 of the stock was sold to M. S. Eisner, deceased, and $2,500 was sold to F. E. Booth and $2,500 was sold to H. G. Maxson. B. D. M. Greene was the holder of $45,000 and other stockholders each held $2,500, more or less, making in all about twenty-five stockholders. In January, 1920, the Novelty Products Company owed the Bank of Italy on certain promissory notes. The bank was asking for security. On that

date, after certain conversations held, F. E. Booth, M. S. Eisner, and B. D. M. Greene signed a written guaranty in the sum of $10,000 in which they recited, ''we hereby promise and agree to pay to you at any time upon demand, in United States gold coin, the full amount of principal and interest due to you from said the Novelty Products Company at the time of said demand, not exceeding the sum of $10,000.'' On March 14, 1920, F. E. Booth was in Europe and a similar paper in the sum of $5,000 was signed by M. S. Eisner and B. D. M. Greene. On May 17, 1920, under similar circumstances the latter two signed another guaranty in the sum of $3,000. Later, when F. E. Booth had returned, the bank asked that it be given one guaranty and that the others be taken up. On November 12, 1920, a document identical in form, but in the principal sum of $18,000, was signed by F. E. Booth alone and was delivered to the bank and thereupon the bank surrendered the three guaranties for $10,000, $5,000, and $3,000 respectively. Thereafter F. E. Booth was compelled to pay the bank. Having paid the bank, he made his claim to the executors to be reimbursed to the extent of one-third of the amount so paid by him. The claim was rejected and thereupon he brought this suit and in his complaint he pleaded his cause of action in accordance with the claim theretofore presented by him.

Whenever the bank asked for a guaranty, B. D. M. Greene communicated the request to the decedent. In turn the decedent acted alone or took the matter up with F. E. Booth and later communicated with B. D. M. Greene. Each of the first three guaranties was on the printed form of the Bank of Italy; each was in duplicate; when B. D. M. Greene received them he signed one copy only and delivered both copies into the hands of M. S. Eisner; and when M. S. Eisner or F. E. Booth, or both, had signed, the signed copy was returned to B. D. M. Greene and he delivered it to the bank. All of these steps were taken as to the one sued on except this, the record shows that B. D. M. Greene never saw either copy after he delivered them to M. S. Eisner. It does not show who delivered it to the Bank of Italy. Although B. D. M. Greene was the principal witness of the plaintiff, he testified that he could not account for his signature not being on the guaranty dated November 12, 1920. There was no evidence explaining its absence. There was no evidence,

oral or written, accounting for the absence of M. S. Eisner's name from the same document except the testimony of F. E. Booth hereinafter set forth.

The appellants claim that the sixth finding is not supported by the evidence. That finding is as follows: "That at the time of the execution of said eighteen thousand dollar ($18,000) guarantee agreement and thereafter, and in consideration of the execution thereof by said F. E. Booth, as aforesaid, the said Milton S. Eisner agreed and acknowledged that he was responsible for, and would pay to F. E. Booth, one-third (⅓) of any amount which the said F. E. Booth might be obliged to and did at any time actually pay to the said Bank of Italy by virtue and because of the execution of said eighteen thousand dollar ($18,000) guarantee agreement by the said F. E. Booth, and that said Milton S. Eisner would pay to the said F. E. Booth said one-third (⅓) of such amount whenever and at such time as the said F. E. Booth paid to the Bank of Italy such sums as the said F. E. Booth became liable for to the said bank because of said eighteen thousand dollar ($18,000) guarantee agreement." The appellants claim there is no testimony in the record to the effect that the deceased promised to pay one-third of the amount paid to the bank by F. E. Booth; that there is no testimony in the record that the deceased authorized F. E. Booth to make any payment to the bank and that there is no testimony in the record that the deceased would repay F. E. Booth "whenever and at such time as" F. E. Booth might pay the bank.

Before proceeding further it should be stated that the F. E. Booth Company had on its books an account of other transactions and of moneys loaned by it to the Novelty Products Company, but none of those matters comes within the scope of this litigation. However, some of the conversations held between the decedent and representatives of the F. E. Booth Company were concerned with the book account and not with the guaranties held by the bank.

[1] When the plaintiff was introducing its case in chief it called F. E. Booth as a witness. The defendants interposed an objection to his testimony. (Code Civ. Proc., sec. 1880, subd. 3.) The objection was sustained and the witness withdrew.

Between the time that the first guaranty was signed and his death, the decedent held conversations from time to time with B. D. M. Greene, James G. Jessie, secretary of the F. E. Booth Company, and H. G. Maxson, assistant general manager of the F. E. Booth Company. The last two took the stand and testified to certain admissions made by the decedent. Some of those admissions tended to support the case of the plaintiff. When the plaintiff rested the defendants called certain witnesses and offered proof of statements made by F. E. Booth and by some of his witnesses inconsistent with the theory of the plaintiff's case. In rebuttal F. E. Booth took the stand and testified as to his recollection as to the connection in which those inconsistent statements were made by him. Among other things in his direct examination, he testified: "I don't know whether it was that particular day or at a subsequent meeting, but I told them why this $18,000 note was signed, and I told them further that Eisner had asked me, in view of the fact that I owned twice as much stock as he did, and in view of the further fact that he didn't want to entangle his financial affairs—he had had some difficulty, he told me, and I told them, with some sheep business and one thing and another, and he asked me as a favor if I would not let his name be off of that note, but that he assured me on his word that this responsibility would not be rubbed out, that it would remain just the same as if his name was on that. All this I explained to young Milton and to Mr. Friedman." The defendants made no objection and made no motion to strike out, but proceeded to cross-examine the witness. On cross-examination, among other things, the witness testified: "At the first one I did not realize that Eisner's name was not on that paper. Had I known that at the time there would not have been any doubt in my mind. Subsequently I recalled that Eisner had requested his name to be left off for the reason that I have given. I had not recalled it up to that time. Subsequently I remember that Eisner's name was not on that note, and that he had asked me as a favor, and explained the reason."

As there was no objection to, or motion to strike out the foregoing testimony, we must consider it. (*Kinley* v. *Largent,* 187 Cal. 71 [200 Pac. 937].) **[2]** The foregoing evidence shows that from the beginning each guaranty was to be signed by three. Nothing to the contrary appearing,

the signers, as between themselves, would be liable for one-third of the obligation assumed. (*Bunker* v. *Osborn,* 132 Cal. 480, 482 [64 Pac. 853].)   When the bank asked for one guaranty in the place of the first three, B. D. M. Greene signed it and delivered the document into the hands of M. S. Eisner for the signatures of M. S. Eisner and F. E. Booth. Nothing was said by anyone showing that B. D. M. Greene was to be released from liability. Nothing was said to the effect that the liability of M. S. Eisner would be increased or decreased, but it was said that it would remain the same as if his name was on the new guaranty dated November 12, 1920. It cannot be claimed, therefore, that there was no evidence that the liability of the decedent was not fixed at one-third.

[3] Under all of the facts it is patent that, upon the demand of the bank, F. E. Booth was bound to pay the bank. As his name was the only name on the guaranty, he was the sole maker. When he requested that his name be left off, M. S. Eisner impliedly waived his right to participate in settling the account with the bank and at the same time he expressly promised to respond to his portion of the amounts so paid by F. E. Booth to the bank.

[4] The uncontroverted evidence was to the effect that M. S. Eisner agreed to bear his burden and that the same should be the same as if his name was on the guaranty dated November 12, 1920. If his name had been on it, it is clear, as we have shown above, that he would have been liable to the extent of one-third. Whenever one of the joint guarantors paid, he would have at once a cause of action against the others, requiring the others to contribute. (Civ. Code, sec. 1432.) The respondent by his pleading claimed no additional or modified liability on the part of the decedent. It may be conceded that there was no direct evidence that F. E. Booth was to be repaid at the time he made his payment. It must also be conceded that there was no direct evidence to the contrary. The respondent's pleading, and the findings made in response thereto, but followed the time of repayment which the law implied. We cannot say the findings were not supported by the evidence on this particular matter.

The appellants claim that neither the findings nor the judgment are supported by the pleadings, and the findings

do not support the judgment. They call attention to paragraph 5 of the complaint and to paragraph 6 of the findings and they claim the latter is narrower than the former. That is true, but if we look at other findings we discover that there is a finding responsive to every allegation contained in the complaint. [5] In this same connection the appellants assert that the agreement as set forth in the findings may be so construed as to bring it within the statute of frauds. That is possible, but the rule is well settled that findings should be so construed, if possible, as to give the judgment force and effect—not to overthrow it. (*Breeze* v. *Brooks*, 97 Cal. 72, 77 [22 L. R. A. 257, 31 Pac. 742].) Following that rule, we have no trouble in saying that the point made by the appellants is not well founded.

The judgment is affirmed.

Nourse, J., and Koford, P. J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 3, 1927.