[No. F030416. Fifth Dist. Sept. 14, 2000.]

MELVIN JANS, as Trustee, etc., Plaintiff and Appellant, v.
WILMA J. NELSON, Individually and as Executor, etc., et al., Defendants
and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II through IV.

**COUNSEL**

Kuhs, Parker & Stanton, William C. Kuhs, Joseph D. Hughes; LeBeau, Thelen, Lampe, McIntosh & Crear and David R. Lampe for Plaintiff and Appellant.

Lerner & McDonald, John Devine, Kenneth E. McDonald; Byrum, Holland, Brumfield & Dietrich and Robert H. Brumfield for Defendants and Appellants.

**OPINION**

**VARTABEDIAN, Acting P. J.**—In this rather complex case, we conclude the trial court, operating in a murky area of law, applied an erroneous

standard of law in determining the amount of contribution that must be paid by coguarantors of a business debt. (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 650, fn. 7 [190 Cal.Rptr. 355, 660 P.2d 813].) Because the relevant facts are undisputed, we apply the correct principles of equity to those facts and direct the trial court to enter a modified judgment.

### Introductory Summary

As we will discuss in some detail below, the law of equitable contribution in California was developed primarily in cases decided from the late 1800's through the 1930's. The equitable principles established in those cases have remained unchanged to the present. Despite the stability of the underlying law, the question presented in this case has not been decided in any published opinion we have been able to discover. That question is: what is the appropriate contributory share among partners who are sureties of a partnership debt? In this part, we will give an overview of the relevant principles; we will give a fuller explanation of our conclusions in the discussion part, below.

 Solvent limited partners who have guaranteed a debt of the partnership have an equitable duty of contribution when a fellow guarantor has satisfied the guaranteed debt. When the partner has guaranteed the partnership debt in his or her role as a partner (as opposed to a role as a manager, agent, creditor or other person affiliated with the partnership in some way), the guarantor's duty of contribution is presumed to be limited by his or her proportionate share of ownership of the limited partnership. In calculating the solvent partners' ownership interests, the court must disregard the ownership interests of any insolvent partners. Thus, absent some other agreement among the coguarantors, a solvent partner's equitable contribution will be proportionate to his or her adjusted percentage of ownership. We will refer to this as the partner's "fair share" of the debt.

Conversely, a partner who has signed a guarantee in his or her role as a partner and who then has fully or partially satisfied the guaranteed debt has a right of contribution from solvent partners who also have guaranteed the debt. The right of the guarantor to contribution is limited to the amount by which the guarantor's actual payment of the guaranteed debt exceeds his or her fair share. Thus, because more than one guarantor may have paid an amount greater than his or her proportionate share, the total fair-share liability of a coguarantor may be greater than the amount any single guarantor is entitled to receive in an equitable action for contribution. The point of the equitable action for contribution is to relieve the unfairness visited upon the guarantor who has paid more than his or her fair share; the point is not to make sure each guarantor pays a fair share.

In this case, we conclude plaintiff Melvin Jans is entitled to recover contribution from defendants Kenneth N. Nelson, Sr., Wilma J. Nelson, and Kenneth N. Nelson, Jr.; the amount of such contribution, however, is limited to the excess of his actual payments over his own fair share of the debt.[1]

### Facts and Procedural History

The present action for contribution was filed by Jans in 1996, but the underlying disputes go back many more years. Because those underlying disputes are relevant to certain issues raised in this appeal, we will give a somewhat detailed account of those disputes.

In 1983, various entities and individuals formed a limited partnership called Rio Bravo Waste Disposal Facility (the partnership). Among the limited partners were the Nelsons and the trustee of the Robert E. Underwood Trust.

Ownership of the partnership was as follows:

| | |
|---|---|
| Rio Bravo Refining Company, the sole general partner | 5.0 percent |
| Edward C. LeLouis, trustee of Robert E. Underwood Trust | 25.3334 percent |
| Kenneth N. Nelson, Sr., and Wilma J. Nelson, husband and wife | 16.5107 percent |
| Kenneth N. Nelson, Jr. | 16.5107 percent |
| Campbell Equipment Co. | 11.875 percent |
| Gregory N. Pratt and Jeannine Pratt, husband and wife | 10.0829 percent |
| Arthur L. Pratt and Arline M. Pratt, husband and wife | 7.5623 percent |
| Edward C. LeLouis | 7.125 percent |

---

[1] Jans sued in his capacity as trustee of the Robert E. Underwood Trust. He is a successor trustee of that trust. The original trustee was Edward C. LeLouis; the first successor trustee was John A. Thomas. In the following factual summary, we will refer generally to "the trustee" as encompassing whichever of these three held the office of trustee at the particular time in question. In references to the present litigation, we will refer to Jans by name; however, all of Jans's involvement in this case is in his capacity as trustee of the Robert E. Underwood Trust.

Kenneth N. Nelson, Sr., died during the course of the litigation in the trial court. Wilma J. Nelson succeeded to his interest, and judgment below was entered against her and Kenneth N. Nelson, Jr., only. Wilma J. Nelson and Kenneth N. Nelson, Jr., have filed joint briefs in this appeal. We will refer to Kenneth N. Nelson, Sr., Wilma J. Nelson, and Kenneth N. Nelson, Jr., collectively as the Nelsons. When it is necessary to distinguish between the two families, we will refer to Wilma Nelson, as representative of her own interest and of the interest to which she succeeded after the death of Kenneth N. Nelson, Sr. We will refer to Kenneth N. Nelson, Jr., as Nelson Jr.

In 1984, the partnership borrowed $750,000 from a predecessor of Bank of America. The bank required each owner of the partnership to execute a "General Continuing Guarantee" in favor of the bank. Where a wife and husband held a unified interest in the partnership, the bank required a separate guaranty from the wife and from the husband.

In 1985, the partnership business ceased operations. The loan went into default. In 1986, the bank sued all of the guarantors. Against some partners—the insolvent ones—the bank obtained judgments. With some, including the Nelsons and Arthur and Arlene Pratt (the Pratts), the bank entered into settlement agreements.[2] The Nelsons immediately defaulted on the settlement agreement. The Pratts continued to make payments pursuant to their settlement agreement, as amended from time to time; they eventually paid $526,000 under the settlement agreement.

Jans's immediate predecessor as trustee, Thomas, contested the bank's claims, contending that his predecessor, LeLouis, did not have the power under the trust agreement to enter into the guarantee. The trustee prevailed in the trial court. On appeal, in an unpublished opinion filed in 1993, this court reversed the judgment. (*Security Pacific National Bank v. Thomas* (June 7, 1993, F016174).) We held the trustee had authority to execute the guaranty of the partnership debt on behalf of the trust. We directed entry of judgment against the trust and in favor of the bank in the full amount of the debt; we noted that the trustee was entitled to seek contribution against other coguarantors.

After remand, the trustee entered into settlement negotiations with the bank. In 1994, various settlement agreements were signed and the obligations of the parties to this appeal were resolved into separate and independent obligations with the bank. The trustee agreed to pay the bank $500,000 and to pay the Pratts $220,000 they claimed to have overpaid under terms of their settlement agreement. A stipulated judgment to this effect was entered against the trustee and in favor of the bank.[3] On July 18, 1996, the bank filed a partial satisfaction of judgment in *Security Pacific National Bank v. Rio*

---

[2] The Nelsons' settlement agreement involved the execution of one promissory note to the bank in the amount of $237,754 and an additional promissory note in the amount of $557,000. The Nelsons' obligations under the additional note would be deemed satisfied in full if the bank entered into any settlement agreement with any of the guarantors other than the Nelsons and the Pratts. Upon execution of the settlement agreement and of the promissory notes, the bank was required to dismiss with prejudice the bank's action against the Nelsons on the guaranty.

[3] The stipulated amended judgment specifically states that the original judgment against the general partner and certain of the insolvent limited partners "shall remain in full force and effect." Further, the judgment states that the bank "is not required to credit [the trustee] for any payments that the Bank receives from [the Nelsons] under the Bank's judgment [obtained

*Bravo Refining Co.* (Super. Ct. Kern County, 1996, No. 193527), the original action filed against the guarantors (from which the Nelsons and the Pratts previously had been dismissed with prejudice), reciting that the bank had received "$500,000 plus interest, in full satisfaction of obligations of defendant John A. Thomas only."

At the same time of the trustee's settlement with the bank, the Pratts entered into mutual releases with both the bank and the trustee in return for payment of $220,000 from the trustee to the Pratts.

Having defaulted on their original settlement agreement, the Nelsons entered into a separate amended settlement agreement with the bank in 1994, requiring the Nelsons to pay the bank a total of $430,000, including amounts already paid. The Nelsons entered into no agreements with the Pratts or the trustee at the time of the 1994 settlements.

When the trustee entered into his 1994 settlement with the bank, the total obligation on the limited partnership's original note was $1,683,917.70, including interest and attorney fees. The total amount paid or agreed to be paid by the various limited partners was $1,455,975.70. Therefore, by our calculation, at the time of the various 1994 settlements, there was $227,942 outstanding on the original judgment in *Security Pacific National Bank v. Rio Bravo Refining Co., supra,* No. 193527, the bank's original collection action. As far as our present record reflects, that judgment is still outstanding and has continued to accrue interest against the insolvent defendants, except to the extent the judgment may have been discharged in bankruptcy as to some of those defendants. (The parties stipulated in the trial court that the insolvent defendants are all of the partners except the Nelsons, the trustee and the Pratts.)

In 1996, Jans filed his complaint in the present action for contribution against the Nelsons. The matter was tried to the court in 1997 based on a stipulation of facts, voluminous documentary exhibits, and testimony of witnesses.

The court issued a statement of decision. It concluded each solvent guarantor was responsible in equity for an equal share of the total sum paid to the bank. It concluded that Mr. and Mrs. Nelson, Sr., and Mr. and Mrs. Pratt (Arthur and Arline) were each separately liable for a contribution share, since each of those four persons had executed a separate guarantee of the debt. Including Jans and Nelson Jr., there were therefore six solvent coguarantors. The court held each of the Nelsons individually liable for one-sixth

in Nelson Jr.'s bankruptcy proceeding] or under any other note held by the Bank, executed by [the Nelsons]."

of the total amount paid to the bank by all of the partners, stipulated to have been $1,455,975.70; each share was $242,662.62.

The court found that the Nelsons had paid or agreed to pay a total of $430,000 to the bank. After giving credit for one-third of the total Nelson payments to each of the Nelsons, the court ordered judgment against Nelson Jr. in the amount of $99,329.29 and Wilma Nelson (individually and as successor to Nelson Sr.) in the amount of $198,658.56. The court awarded Jans prejudgment interest on the net amounts due from each appellant. Judgment was entered accordingly on December 24, 1997. The court denied the Nelsons' motion for new trial.

The Nelsons filed a timely notice of appeal. Jans filed a notice of cross-appeal, contending the court should have made the judgment against the Nelsons joint and several.

## Discussion

### I. The Parties' Proportionate Liability for Contribution

Civil Code section 1432 provides that a party to a joint or joint and several obligation, "who satisfies more than his share of the claim against all, may require a proportionate contribution from all the parties joined with him." (See also Civ. Code, § 2848.) In this section, we consider the "proportionate contribution" concept set forth in Civil Code section 1432.

■ An action to enforce the right of contribution is governed by equitable principles. (*Overholser v. Glynn* (1968) 267 Cal.App.2d 800, 807 [73 Cal.Rptr. 628].) Although an express or implied agreement allocating contribution among the parties usually will be honored (*Booth v. Friedman* (1927) 82 Cal.App. 174, 178-179 [255 P. 222]), in the absence of such an agreement, the allocation of contribution "rests upon principles of equity and natural justice." (*Blankenhorn-Hunter-Dulin Co. v. Thayer* (1926) 199 Cal. 90, 96 [247 P. 1088, 48 A.L.R. 797]; see also 14 Cal.Jur.3d (1999) pt. 2, Contribution and Indemnification, § 3, p. 11.)

These considerations of "equity and natural justice" have resulted in two differing presumptions concerning the appropriate "proportionate contribution" to be imposed by a court of equity. ■ As set forth in the Restatement of Restitution, "Where persons are engaged in a common enterprise, their liability to contribution to each other is unequal if their interests in the enterprise are unequal or if they so agree. Likewise, persons secondarily liable may share the duty of contribution unequally, as where one or more of

them limit liability to specified portions of the obligation or to specified amounts. In all such cases their liability to contribution is dependent upon the apportionment between them." (Rest., Restitution, § 85, com. f, p. 382.) Thus, where business associates are directly liable on a business debt, their shares of contribution among themselves are presumed to be proportionate to their ownership interest in the business. Where the debt arises from a secondary obligation, such as surety or guaranty, it is presumed contribution will be assessed in equal shares among those secondarily liable. (See *Curtis v. Cichon* (Fla.Dist.Ct.App. 1985) 462 So.2d 104, 105.)

This distinction is well established, though often left unstated, in California case law. Solvent joint debtors primarily liable on a debt are routinely held equitably liable for contribution in proportion to their ownership interest, in the absence of a showing of an agreement to the contrary. Conversely, where the joint debtors are secondarily liable—as in the case of indorsers or guarantors—the cases routinely presume the solvent debtors will contribute equally to payment of the debt, in the absence of a showing of a contrary agreement. We recount some of the cases briefly.

In *Tucker v. Nicholson* (1938) 12 Cal.2d 427 [84 P.2d 1045], the issue was one of equitable contribution among ten persons who were joint owners of mortgaged land. Two of the owners had one-sixth interests in the property, and the remaining eight owners each had a one-twelfth interests In concluding the trial court had awarded an excessive contribution share against one of the one-twelfth owners, the court stated: "The liability *inter se* of the comakers of a note given for the purchase price of land is presumptively proportionate to their interest in the land. . . . [¶]. . . [¶] If contribution cannot be obtained from any joint debtor by reason of his insolvency, the loss arising therefrom is borne proportionately by the solvent co-obligors." (*Id.* at pp. 433-434; see also *Clark v. Austin* (1892) 96 Cal. 283, 284 [31 P. 293].)

Similarly, *Woolley v. Seijo* (1964) 224 Cal.App.2d 615 [36 Cal.Rptr. 762], involved equitable contribution for business debts of a joint venture whose members owned unequal shares. The appellate court held that the proportionate liability of the defendant coventurer for equitable contribution was limited to his 10 percent ownership interest in the joint venture. (*Id.* at pp. 621-623; see also *Wall v. Siegel* (1998) 62 Cal.App.4th 875 [73 Cal.Rptr.2d 102].)

By contrast, cases involving guarantors and other sureties state the opposite presumption. *Niederer v. Ferreira* (1987) 189 Cal.App.3d 1485 [234 Cal.Rptr. 779], for example, involved parties who had guaranteed a corporate promissory note as part of the purchase and sale of a business. In the

course of resolution of cross-claims among the defendant guarantors, a guarantor who controlled 51 percent of the stock of the corporate promissor sought equitable contribution from the husband and wife who owned 49 percent of the stock. All three parties had signed an unrestricted guaranty of the promissory note. The appellate court stated the generally applicable rule: "Defendant is correct that a guarantor who has paid an obligation under a guaranty has the right to require contribution from coguarantors. . . . Absent an agreement to the contrary, each guarantor is liable for an equal portion of the obligation." (*Id.* at p. 1509.) The court ruled against the cross-claimant, however, since the evidence supported an inference that his payment of the debt had been on behalf of the corporation, and not on his own behalf as a guarantor.

In *Bunker v. Osborn* (1901) 132 Cal. 480 [64 P. 853], the issue of contribution arose between two owners of a mining corporation who became liable as indorsers of a corporate promissory note. The corporate note had been given to the bank in exchange for the personal note of the two men in the same amount; the two men had endorsed the corporate note. The opinion does not disclose the extent of each indorser's ownership of the corporation, although there is perhaps an implication that they were the two sole owners of the stock of the corporation. (See *id.* at p. 481.) In any event, the Supreme Court stated the general rule: "The parties had jointly indorsed the note, and the presumption arising from that fact is, that they were equally liable, and there is nothing in the record to rebut that presumption." (*Id.* at p. 482.)

The situation of the parties is more clearly stated in *Booth v. Friedman, supra,* 82 Cal.App. 174. There, one of the guarantors of a corporate note owned 45 percent of the corporation and the other two guarantors owned 2.5 percent each. The remaining shares were owned by 2.5 percent shareholders who had not guaranteed the note. In this action for equitable contribution by one of the 2.5 percent owners against the estate of the other 2.5 percent owner, the court stated: "The foregoing evidence shows that from the beginning each guaranty was to be signed by the three. Nothing to the contrary appearing, the signers, as between themselves, would be liable for one-third of the obligation assumed." (*Id.* at pp. 178-179; see also *Overholser v. Glynn, supra,* 267 Cal.App.2d at pp. 803, 807.)

The question left unresolved by any California case we have discovered is, what constitutes "something to the contrary" that permits or requires a conclusion that unequal allocation of contribution liability is the just and equitable result? In examining this question, we begin with a fundamental principle of equity: "He who takes the benefit must take the burden." (Civ. Code, § 3521.) Further, "equality of liability among persons whose respective situations are not equal is inequitable." (*Jessup Farms v. Baldwin, supra,*

33 Cal.3d at p. 650, fn. 7.) Finally, we reiterate that the issue is not one of "implied contract" in the sense of imputing to the parties an agreement or understanding inherent in their original contract but, rather, is a matter of application of sound equitable principles to relieve an inequitable burden on one coguarantor who has paid more than a just portion of the joint debt. (*Pacific Freight Lines v. Pioneer Exp. Co.* (1940) 39 Cal.App.2d 609, 613 [103 P.2d 1056].)

In *Booth* and *Niederer*, which imposed contribution on shareholder-guarantors in equal shares, not all of the shareholders of the corporate promisor guaranteed the debt. In *Booth*, only three of the 23 shareholders guaranteed the notes in question. (*Booth v. Friedman, supra,* 82 Cal.App. at pp. 175-176.) In *Neiderer*, the 49 percent shareholders and the shareholder who controlled—but did not own—the other 51 percent of the stock signed the guaranties. "Friends and family" of that shareholder owned a portion of the 51 percent and, as far as the opinion indicates, did not sign the guaranty. (See *Niederer v. Ferreira, supra,* 189 Cal.App.3d at pp. 1491-1492.) Thus, in both cases, it appears to be a fair inference that mere status as shareholder was not the basis for signing the guaranty. Since not all of the shareholders signed the guaranties, there was no equitable reason to treat the contribution obligation as an incident of stock ownership. We infer that active management or some other unstated factor caused the subgroup of shareholders to guarantee the debt; that factor apparently made it equitable to allocate contribution equally among the guarantors in *Booth* and *Niederer*.

As noted above, in *Bunker*, there is an implication that the two indorsers of the corporate note were the only shareholders of the mining corporation and that both had been active in the business. In any event, the share of equitable contribution was not a contested issue before the court in that case. (See *Bunker v. Osborn, supra,* 132 Cal. at p. 482.)

By contrast with those three cases, in the present case the guarantors of the limited partnership's note constituted all owners of the partnership, and included both partners active in the daily management of the business and partners whose participation was solely financial. The inference is inescapable that the guarantors were called upon to sign the guaranties solely because of their partnership interest. Those partnership interests varied greatly, from 25 percent to 7.125 percent; rights to profits of the partnership were tied directly to the ownership interest. This constitutes an adequate showing that the guarantors signed as partners, indicating an intent that their contributory shares would reflect their relative interests in the partnership.

We conclude that in a circumstance in which all limited partners execute guaranties of a partnership debt and there is no other express agreement

concerning rights of contribution, equity requires the proportionate obligation for contribution to be based upon the ownership interest of the various guarantors. (See *Curtis v. Cichon, supra,* 462 So.2d at p. 107 (dis. opn. of Grimes, J.).) Those who own the right to "the benefit [of the partnership's business activity] must take the burden." (Civ. Code, § 3521.) The legitimate expectations of owners of differing interests in a limited partnership are not equal; "equality of liability among persons whose respective situations are not equal is inequitable." (*Jessup Farms v. Baldwin, supra,* 33 Cal.3d at p. 650, fn. 7.)

Jans has not asserted any reason in law or logic why it should make a difference among the partners whether they all signed the note as comakers or they all signed as guarantors. In the circumstances of this case, equity requires there be no difference in result. As the liability for contribution among comakers would be proportionate to their ownership shares, so must it be among these coguarantors.

The parties themselves operated as if the obligation to contribute to payment of the promissory note was proportionate to ownership interest in the limited partnership. (See *Wilmarth v. Hartman* (1927) 238 Mich. 20 [213 N.W. 73, 74].) Thus, the trustee's attorney (William Kuhs) testified to the following discussion between himself and counsel for the Nelsons and the Pratts (Harvey Means), at the time of a settlement conference in the action brought by the bank on the guaranties:

"Q: Describe the conversation that took place between you and Mr. Means?

"A [William Kuhs]: Mr. Means was trying to put together a package. We did not have—it was not communicated to me that we had a dollar amount that the bank would [accept] by way of settlement. Mr. Means proposed that the Underwood Trust put up an amount that would fill in the gap, if you will, between what the Pratts and the Nelsons would contribute. And Mr. Means indicated the Pratts and Nelsons would contribute their pro rata share based upon partnership interest.

"Q: Did he say anything else, if you recall, I mean in that initial conversation?

"A: No. That was the general format. I had a fairly detailed conversation with Mr. Means with respect to who was going to pay the shares for the insolvent partners.

"Q: What did you tell him in this regard?

"A: I told Mr. Means that, in fact, I had made calculations prior to going into the settlement conferences as to what the adjusted partner's interest would be to reflect the insolvency of the three of the limited partners or three groups of the limited partners. And I told Mr. Means that it was entirely unreasonable to expect the Underwood Trust to pick up not only its share but also the shares of the insolvent guarantors. That was just not going to happen.

"Q: Why did you consider that to be unreasonable?

"A: It was unreasonable in two senses. No. 1, that wasn't the law. And, No. 2, the Underwood Trust had a defense to the action that no other guarantor had."

Responsibility under the guaranties based on proportionate ownership of the limited partnership also was the implicit basis for what the parties refer to as the "global settlement" that ultimately resulted in release of the bank's claims against the Nelsons, the trustee and the Pratts. In particular, as reflected in a memorandum from the bank's attorney to counsel for the guarantors, the guarantors would pay unequal shares; the payments from the Nelsons would not be credited to the trustee's remaining balance and vice versa.

It is true that the complaint for contribution in the present case demands an equal-share contribution from each of the three Nelsons—that is, a contribution share not based on percentage of ownership—but, as far as we can tell from the record, this is the first time in the long history of this dispute that anyone proposed a simple per capita basis for contribution. (See *Wilmarth v. Hartman, supra,* 213 N.W. at p. 75.)

In this case, all of the equities favor apportionment of contribution on the basis of percentage of ownership, adjusted for insolvency of some of the guarantors. The guarantors clearly entered into the guaranties because of their status as owners of the partnership and no action or agreement of the parties has indicated any intention that the guarantors' contribution shares be apportioned in disregard of those ownership interests.

By requiring an express written agreement among the coguarantors in order to establish unequal contribution shares, the trial court erred. Instead, the amount of such contribution shares is to be determined "upon principles of equity and natural justice" in light of the totality of the circumstances. (*Blankenhorn-Hunter-Dulin Co. v. Thayer, supra,* 199 Cal. at p. 96.) On the facts of the present case, allocating contribution shares equally among the

solvent guarantors—and thereby wholly disregarding their respective interests in the limited partnership that is the sole basis for their guaranties—would be "palpably unjust." (*Jessup Farms v. Baldwin, supra,* 33 Cal.3d at p. 650, fn. 7 [dicta].)

## II.-IV.*

. . . . . . . . . . . . . . . . . . . . . . . . .

### *Disposition*

The judgment is reversed. The trial court shall enter a modified judgment that shall award to Jans from the Nelsons, jointly and severally, $160,468.54, together with interest at the rate of 7 percent per annum commencing August 8, 1994, and continuing to the date the modified judgment is entered, together with Jans's costs in the trial court. Each party shall bear his or her own costs on appeal.

Thaxter, J., and Harris, J., concurred.

---

*See footnote *ante*, page 848.