Filed 7/25/23  Siegelman v. Salimi CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DEBRA SIEGELMAN, | D079923 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2018-00003153-CU-BC-CTL) |
| ELLIE SALIMI, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed in part and reversed in part with directions.

Mazur & Mazur and Janice R. Mazur for Plaintiff and Appellant.

Frisella Neilson, Lisa J. Frisella, Kimberly D. Neilson and Amy L. Pierson for Defendant and Respondent.

INTRODUCTION

Debra Siegelman purchased a residential property with David Barber, as tenants in common.  They intended to split the property in two, replace the existing "granny flat" with a new house, and then each take one of the two

houses on the property. The partners successfully implemented their plan. Siegelman rented out the existing house (Unit 1), while Barber lived in the new house (Unit 2) with his companion, Ellie Salimi. Barber built Unit 2 using lines of credit secured by Unit 1 and loans from Siegelman and Salimi.

Trouble arose when Barber needed to raise cash to pay down his debts. With Siegelman's support, Barber sold Unit 2 to Salimi. Barber used the sale proceeds to pay down some of his debts but was unable to pay the remaining $117,000 he owed Siegelman by the time Siegelman sold Unit 1 to a third party. Siegelman paid off the debts and demanded reimbursement from Barber and Salimi. Although Salimi paid Siegelman $80,000 when she refinanced Unit 2, Barber and Salimi refused to pay the remaining $37,000.

Siegelman filed suit against Barber and Salimi. In a bifurcated bench trial, Siegelman obtained a judgment against Barber for $37,000. However, Barber discharged his debt through bankruptcy. Siegelman then amended her complaint to allege causes of action solely against Salimi for breach of contract and unjust enrichment. The trial court granted summary judgment in favor of Salimi on all counts.

On appeal, Siegelman asserts the trial court erred in three respects. First, Siegelman contends that a triable issue of material fact exists as to whether Salimi entered an implied contract with Siegelman to repay Barber's debts. Second, Siegelman contends that a separate triable issue of material fact exists as to whether Barber acted as an agent for Salimi in reaching an agreement with Siegelman to pay Barber's debts. On these issues, we find no error in the court's ruling. Thus we affirm the judgment in favor of Salimi on the breach of contract cause of action.

Third, Siegelman contends the trial court erred in finding her unjust enrichment claim failed, as a matter of law, in the absence of breach of

contract or fraud. Because we conclude neither is necessary for a claim of unjust enrichment under these circumstances, we reverse the summary judgment in favor of Salimi on the unjust enrichment claim.

FACTUAL AND PROCEDURAL BACKGROUND[1]

I.

*The Partnership Between Siegelman and Barber*

In 2002, Siegelman and Barber purchased 4883 Narragansett Avenue in the Ocean Beach area of San Diego as tenants in common. The property included a two-bedroom house in the front and a one-bedroom granny flat in the back. Siegelman controlled the existing two-bedroom house, which she rented to others, and Barber lived in the granny flat.

Siegelman and Barber financed their purchase of the property with a loan of $310,000 and $80,000 in cash. Responsibility for the loan was split between Siegelman and Barber. They also took out a $48,000 line of credit, for which Barber was fully responsible. Siegelman loaned Barber $26,667 for his portion of the down payment.

Siegelman and Barber later agreed to further develop the property. Their goal was to split the property, demolish the granny flat, and build a new house in its place. The plan was for Barber to own and reside in the new house with an address of 4885 Narragansett Avenue (Unit 2), while Siegelman would own the existing house with the address of 4883 Narragansett Avenue (Unit 1). Siegelman and Barber agreed that Siegelman

---

[1] Because this is an appeal from a grant of summary judgment in favor of Salimi, "we view all conflicting facts in favor of [Siegelman], the party who opposed the motion for summary judgment." (*Davis v. Nadrich* (2009) 174 Cal.App.4th 1, 3, fn. 1; accord *Birschtein v. New United Motor Manufacturing, Inc.* (2001) 92 Cal.App.4th 994, 999.)

3

would own two-thirds of the property and Barber would own one-third. Pursuant to their agreement, Barber filed a condominium plan with the City of San Diego in May 2006. The existing house was designated as Unit 1 in the condominium plan, while the new, yet-to-be-constructed house was designated as Unit 2.

To generate funds for the construction of Unit 2, Siegelman and Barber decided to refinance the property. In advance of refinancing, Siegelman executed a grant deed on October 23, 2006 to transfer title to the property entirely into Barber's name so that he could secure favorable owner-occupied interest rates. The grant deed identified the transferred property as:

> "A CONDOMINIUM COMPRISED OF: PARCEL 1: AN UNDIVIDED ONE-HALF (1/2) INTEREST IN AND TO PARCEL 1 OF PARCEL MAP NO. 19790, IN THE CITY OF SAN DIEGO . . . EXCEPTING THEREFROM: A. ALL UNITS AS SHOWN ON THE CONDOMINIUM PLAN OF 4883 &; 4885 NARRAGANSETT AVENUE CONDOMINIUM PLAN, . . . PARCEL 2: UNIT 1 AND UNIT 1A AS SHOWN ON THE CONDOMINIUM PLAN OF 4883 &; 4885 NARRAGANSETT AVENUE. PARCEL 3: A PEDESTRIAN ACCESS EASEMENT AND ACCESS EASEMENT OVER UNIT 2 AS SHOWN ON SAID CONDOMINIUM PLAN, AS APPURTENANT TO PARCELS 1 AND 2 ABOVE DESCRIBED."

Following the transfer from Siegelman, Barber completed the refinance, including the execution of a deed of trust to Washington Mutual Bank on November 3, 2006. The deed of trust identified the property by the "Parcel ID Number" 44827234. It described the property as:

> "A CONDOMINIUM COMPRISED OF:
>
> "PARCEL 1:
>
> "AN UNDIVIDED ONE-HALF (1/2) INTEREST IN AND TO PARCEL 1 OF PARCEL MAP NO. 19790, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, FILED IN THE OFFICE OF THE COUNTY RECORDER OF

4

SAN DIEGO COUNTY, JULY 20, 2005 AS INSTRUMENT NO. 2005-0612151 OF OFFICIAL RECORDS.

"EXCEPTING THEREFROM:

"A. ALL UNITS AS SHOWN ON THE CONDOMINIUM PLAN OF 4883 & 4885 NARRAGANSETT AVENUE CONDOMINIUM PLAN, AS RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, MAY 23, 2006 AS FILE NO. 2006-0363375 OF OFFICIAL RECORDS.

"B. THE EXCLUSIVE RIGHT TO USE THE EXCLUSIVE USE COMMON AREAS AS SET FORTH ON SAID CONDOMINIUM PLAN.

"PARCEL 2:

"UNIT 1 AND UNIT 1A AS SHOWN ON THE CONDOMINIUM PLAN OF 4883 & 4885 NARRAGANSETT AVENUE.

"PARCEL 3:

"A PEDESTRIAN ACCESS EASEMENT AND ACCESS EASEMENT OVER UNIT 2 AS SHOWN ON SAID CONDOMINIUM PLAN, AS APPURTENANT TO PARCELS 1 AND 2 ABOVE DESCRIBED."  (Boldface omitted.)

Aside from some formatting changes, the above description matches that on Siegelman's October 23, 2006 grant deed.  The deed of trust further stated the property included "all the improvements now or hereafter erected on the property" and "[a]ll replacements and additions."

The refinance included a loan of $410,300 and a new line of credit of $122,400.  Siegelman and Barber agreed that Siegelman would be responsible for repayment of two-thirds of the loan, while Barber would be responsible for one-third.  They also agreed that Barber would be fully responsible for repayment of the line of credit.  Barber used the line of credit

and cash out of $106,000 from the loan to repay his debt to Siegelman for $26,667 of the original down payment and to build Unit 2.

In 2008, Siegelman loaned Barber $80,000. Siegelman and Barber subsequently decided to document their financial and ownership arrangement in a written agreement. The agreement specified their split in ownership of the property, with Siegelman owning "66.667%" and Barber owning "33.333%." It also mentioned the 2006 refinance of the property and stated that "4883 Narragansett [Unit 1] is the sole collateral" for the new loan, while "4885 Narragansett [Unit 2] is free and clear." The agreement summarized Siegelman and Barber's financial commitments, including the recent $80,000 loan from Siegelman to Barber "to help with the remodel of 4885 Narragansett." It concluded with a provision stating Siegelman would receive ownership of Unit 2 if Barber was unable to complete its construction. Siegelman and Barber added a handwritten caveat that if any profit remained after payment of the debts, Barber's "companion," Salimi, would receive "10% of total profit." They added a further handwritten note in the summary of financial commitments that Barber owed Salimi $40,000. Salimi later loaned Barber an additional $45,000 to fund the construction of Unit 2.

II.

*Barber's Sale of Unit 2 to Salimi*

Before 2011, Barber unsuccessfully sought additional financing to pay off at least one of the lines of credit for which he was responsible. Given his lack of success, Siegelman and Barber came up with the idea of having Salimi

6

purchase Unit 2 from Barber to generate additional funds.[2] Salimi had resided with Barber in Unit 2 since 2009.

Siegelman, Barber, and Salimi met in person in Unit 2 in the spring or summer of 2011 to discuss the idea of Salimi purchasing Unit 2. Siegelman and Barber agreed that Barber would use the proceeds from the sale of Unit 2 to pay down his debt to Siegelman. Siegelman and Barber dispute the extent to which they discussed and agreed on (1) a divide in ownership of Unit 2 between Salimi and Barber, (2) any subsequent refinancing by Salimi, (3) the contingent issuance of a note payable to Siegelman secured by Unit 2, and (4) the timing and amount of Barber's debt repayments to Siegelman. However, both Siegelman and Barber agree Salimi was quiet during the meeting and did not actively participate in the discussions.

Barber had Siegelman execute a "Correction Grant Deed" on June 24, 2011, which purported to correct the property description in the October 23, 2006 grant deed that Siegelman had previously executed. (Capitalization and boldface omitted.) The corrected description changed "Unit 1 and Unit 1A" in the "Parcel 2" description to "Unit 2" and changed the access easement in the "Parcel 3" description from over "Unit 2" to over "Unit 1." (Capitalization omitted.) On the same day, Barber executed a grant deed to Salimi with the same property description as the Correction Grant Deed executed by Siegelman (aside from what appears to be a typo in the description of "Parcel 3" regarding the unit with an access easement). That grant deed was not recorded until March 13, 2012.

---

[2] Siegelman and Barber disagree regarding who originally came up with the idea of selling Unit 2 to Salimi. Regardless, both appear to have eventually agreed with that approach for generating funds to pay off at least some of Barber's debts.

7

Siegelman helped Salimi obtain financing of around $290,000 for the purchase of Unit 2 from Barber. Barber accepted that amount as the entire purchase price for Unit 2. The funds issued and the sale concluded on March 9, 2012. Unit 2 had been appraised at $440,000 less than a year before. On the same day the sale concluded, Salimi executed a grant deed transferring a 25 percent interest in Unit 2 to Barber. That grant deed was recorded March 19, 2012.

After accounting for fees, Barber received around $220,000 from the sale of Unit 2, which he used to pay off the $80,000 loan from Siegelman and a portion of the existing lines of credit against Unit 1. Following the sale, Siegelman emailed Salimi, "thanks for hanging in there re[garding] loan." Salimi responded, "You're welcome. I hope everything goes well & soon you can free your house too."

Salimi later discovered a lien had previously been placed on Unit 2 in connection with Barber's credit card debt of around $29,000. Salimi eventually paid Barber's lender around $24,000 to remove the lien from Unit 2. Barber executed a grant deed on June 17, 2013 to give his 25 percent interest in Unit 2 back to Salimi.

In August 2015, Siegelman emailed Salimi about setting up a living trust that designated Barber's ownership portion of Unit 2. Salimi responded, "Ok Debbie. Thank you!" Salimi never directed any further communications to Siegelman after that response.

### III.

*Siegelman's Sale of Unit 1*

Siegelman informed Barber and Salimi in early 2017 that she would be selling Unit 1. Barber executed a quitclaim deed to remove himself from the title for Unit 1 so the sale could close. Siegelman also asked Barber to repay

8

the remaining approximately $117,000 that he owed for debt secured by Unit 1. Barber informed Siegelman over the phone that Salimi intended to refinance Unit 2 to generate funds to repay Barber's debts. Siegelman's sale of Unit 1 closed on May 1, 2017. Following the closing, Barber periodically texted and emailed Siegelman regarding the status of Salimi's refinance of Unit 2.

Salimi refinanced Unit 2 in June 2017 with cash out of $115,925.10. Following receipt of the funds from the refinance, Salimi paid $80,000 to Siegelman in July 2017. Barber informed Siegelman "[w]e are going to transfer $80,000 for now until we see what happens with the front house," an apparent reference to plumbing work that had to be completed on Unit 1 in connection with its sale. In a follow-up email to Barber, Siegelman copied Salimi and said, "I would prefer you to pay in full Dave [Barber]. I am owed that much trust."

Siegelman and Barber met in September 2017 to discuss the remaining $37,000 owed to Siegelman. Barber offered $20,000 to settle the debt based on his contention that he "was entitled to some form of reimbursement for the cost of the tentative map, parcel map, condo plan, CC&Rs, recordings, survey, and associated fees to the City of San Diego, as well as any construction related to 4883." Siegelman rejected Barber's offer.

IV.

*Siegelman's Lawsuit*

A. *The Original Complaint and Bifurcated Trial*

Siegelman filed suit against Barber and Salimi in January 2018. Siegelman alleged that Barber had breached their partnership agreement, and she requested an accounting of the partnership. Siegelman also

9

requested the imposition of a constructive trust on Unit 2 so that Salimi would hold title for the benefit of Siegelman.

Barber and Siegelman eventually stipulated that Barber owed Siegelman $37,000, plus interest. The trial court then conducted a bench trial of "stipulated bifurcated issues" on March 25, 2019. That trial addressed two issues: (1) whether Siegelman and Barber had engaged in a partnership, and (2) whether Salimi and/or Barber hold Unit 2 as a constructive trustee for Siegelman.

On the first issue, the trial court found Siegelman and Barber had formed an oral partnership for the purpose of developing the Ocean Beach property. The court found the oral partnership had been ratified by Siegelman's and Barber's conduct from 2002 to 2017. As a result, Barber had no entitlement to payment for his services provided to the partnership. As for the second issue, the trial court declined to impose a constructive trust on Unit 2. It found that Salimi had properly acquired Unit 2 from Barber and that Siegelman had no right to Unit 2.

B. *Barber's Bankruptcy*

Following the trial court's determination that Barber owed Siegelman $37,000, Barber filed a petition for Chapter 7 bankruptcy in September 2019. Siegelman filed an adversarial complaint during Barber's bankruptcy to prevent discharge of his debt to her. The bankruptcy court discharged Barber's debt over Siegelman's objections. The bankruptcy case closed in August 2020.

C. *The First Amended Complaint*

Siegelman then filed an amended complaint solely against Salimi in October 2020. Siegelman asserted Salimi, as part of her purchase of Unit 2 from Barber, had agreed to pay Barber's debt obligations to Siegelman. In

10

the first cause of action for breach of contract, Siegelman alleged Salimi had breached her agreement with Siegelman by failing to pay the $37,000 still owed by Barber. In the second cause of action for fraud, Siegelman alleged Salimi had made material misrepresentations to her in connection with the purchase of Unit 2 and the agreement to pay Barber's debts to Siegelman. In the third cause of action, Siegelman alleged Salimi had been unjustly enriched through the acquisition of Unit 2, particularly by receiving it "free and clear of any encumbrances, at a price vastly below Unit 2's fair market value, as a consequence of [Siegelman] having been induced to pay off the entirety of the indebtedness attributable to Barber and Unit 2 and secured against the Property."

D.    *Salimi's Motion for Summary Judgment*

Salimi filed a motion for summary judgment in July 2021 against all three of Siegelman's causes of action. She asserted that: Siegelman could not establish the basic elements of an oral contract. Even if Siegelman could establish an oral contract, the trial court had already determined Barber, not Salimi, was the rightful debtor. Siegelman's first amended complaint did not sufficiently relate back to the original complaint, which resulted in all three causes of action being time-barred. Finally, Siegelman could not meet the essential pleading requirements for fraud.

The trial court granted Salimi's motion for summary judgment as to all three causes of action in October 2021. The court found "undisputed admissible evidence" that Salimi had not entered an oral agreement with Siegelman. Regarding Siegelman's argument that Barber had contracted with Siegelman as an agent for Salimi, the court found "no evidence establishing that Salimi intended to create an agency relationship with Barber such that Barber's purported statements could bind Salimi." It

11

further found "no evidence suggesting that Salimi held Barber out as her agent for this purpose, or ratified any purported statement made by Barber." As for the unjust enrichment cause of action, the trial court found it was "predicated on the alleged breach of oral contract and fraud." Because it had already found no agreement by Salimi to satisfy Barber's debt to Siegelman, the court concluded that no actual controversy existed regarding unjust enrichment. It entered judgment in favor of Salimi. Siegelman appeals from that judgment.

DISCUSSION

I.

*Applicable Legal Principles and Standard of Review*

Summary judgment is appropriate when the moving party establishes there is no triable issue of material fact under the pleadings and the moving party is entitled to judgment as a matter of law. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) A triable issue of material fact exists if the evidence would allow a reasonable trier of fact to make a factual finding that is necessary under the pleadings in favor of the party opposing the motion. (*Id.* at pp. 843, 850.)

A defendant moving for summary judgment has the initial burden of presenting evidence sufficient to establish the plaintiff either cannot prove at least one element of, or that there is a complete defense to, each cause of action as alleged in the complaint. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra,* 25 Cal.4th at pp. 850, 853; *Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493 ["the burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability *as alleged in the complaint*; that is, a moving party need not refute liability on some theoretical possibility not included in the pleadings"].)

12

If the defendant does so, the burden shifts to the plaintiff to present evidence demonstrating there is a triable issue of material fact.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra,* 25 Cal.4th at p. 850.)  The plaintiff may not rely on the allegations in the pleadings but, instead, "must 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto.' " (*Aguilar,* at p. 849; Code Civ. Proc., § 437c, subd. (p)(2).)  At the same time, though, the court may not weigh the evidence and must deny the motion if the evidence presented by the opposing party, or any inference reasonably drawn from it, raises a triable issue of material fact.  (*Aguilar,* at p. 856.)

On appeal from a summary judgment, we apply the same legal standard used by the trial court and independently assess the correctness of the trial court's ruling.  (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 231.)  "[W]e examine the record de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.)  However, " '[a]s with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority.  In other words, review is limited to issues which have been adequately raised and briefed.' " (*Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 230.)

## II.

### *The Breach of Contract Cause of Action*

Siegelman asserts the trial court erred in granting summary judgment on the breach of contract cause of action, for two reasons.  First, Siegelman

argues the court incorrectly found no implied-in-fact contract existed between Siegelman and Salimi. Second, Siegelman argues the court incorrectly found Barber had not acted as Salimi's agent in making a contract with Siegelman to repay Barber's debts. Because we conclude Siegelman has not presented a triable issue of material fact on either issue, we affirm the court's judgment in favor of Salimi on Siegelman's breach of contract claim.

A.    *No Implied-in-Fact Contract Existed Between Siegelman and Salimi*

A contract may be either express or implied. (Civ. Code,[3] § 1619.) The "existence and terms" of an implied contract "are manifested by conduct." (§ 1621.) The elements essential to the existence of a contract include (1) parties capable of contracting, (2) consent, (3) a lawful object, and (4) sufficient cause or consideration. (§ 1550.) These elements do not differ between express and implied contracts. (*Pacific Bay Recovery, Inc. v. California Physicians' Services, Inc.* (2017) 12 Cal.App.5th 200, 215 (*Pacific Bay*).)

Consent to an implied contract must be mutual and will not be deemed such "unless the parties all agree upon the same thing in the same sense." (§§ 1565, 1580.) An implied contract, like an express contract, "must be founded upon an ascertained agreement of the parties to perform it, the substantial difference between the two being in the mere mode of proof by which they are to be respectively established." (*Smith v. Moynihan* (1872) 44 Cal. 53, 62–63 (*Smith*); accord *Pacific Bay*, *supra*, 12 Cal.App.5th at p. 215 [holding that an implied contract must be "consensual in nature" and "founded upon an ascertained agreement"].)

---

3    All further undesignated statutory references are to the Civil Code.

14

Whether an implied contract has been created is a question of fact "determined by the act and conduct of the parties and all the surrounding circumstances." (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 611; accord *Smith*, *supra*, 44 Cal. at p. 63.) The parties must have "acted in such a manner as to provide the necessary foundation" for the implied contract, taking into consideration any evidence showing another explanation for the parties' conduct. (*Silva v. Providence Hospital of Oakland* (1939) 14 Cal.2d 762, 774.) Where the evidence is conflicting, or where reasonable conflicting inferences may be drawn from the evidence, a triable issue of material fact exists. (*Unilab Corp. v. Angeles-IPA* (2016) 244 Cal.App.4th 622, 636.)

Siegelman identifies five primary facts in support of her claim she entered an implied contract with Salimi: (1) Salimi was present at a meeting in 2011 in which Siegelman and Barber discussed having Salimi purchase Unit 2 from Barber so that Barber could pay off debt owed to Siegelman; (2) Siegelman assisted Salimi in obtaining financing for the purchase of Unit 2, resulting in Salimi taking out a mortgage of around $290,000 in March 2012; (3) following execution of the mortgage, Salimi emailed Siegelman, "I hope everything goes well [and] soon you can free your house too"; (4) Salimi refinanced Unit 2 in June 2017 with cash out of $115,925.10 after Siegelman informed Barber that his remaining debt to her totaled "about $115,828"; and (5) Salimi deposited $80,000 of the $115,925.10 into Siegelman's account, using a deposit slip Siegelman had provided to Barber.

We conclude none of these facts identified by Siegelman, individually or collectively, raise a triable issue of material fact regarding the creation of an implied contract between Siegelman and Salimi. Siegelman has presented no evidence establishing an "ascertained agreement" between the parties.

15

Siegelman does not dispute that Salimi did not say much, if anything, during the 2011 meeting between Siegelman, Barber, and Salimi. As Siegelman's counsel acknowledged at oral argument, her claim of an implied contract relies on Salimi's actions following the meeting, not the meeting itself.

The problem for Siegelman is Salimi's actions do not comport with the precise contractual terms argued by Siegelman, namely that Salimi agreed to pay *all* of Barber's then outstanding debts to Siegelman. Siegelman does not contend that the mortgage Salimi obtained as part of her purchase of Unit 2 in 2012 provided sufficient funds so Barber could pay off all his debts to Siegelman. Indeed, Barber could only pay a portion of his debts with those proceeds.

Salimi's subsequent statement to Siegelman—"I hope everything goes well [and] soon you can free your house too"—gives no indication that Salimi had made any sort of commitment to pay all (or even a part) of Barber's debts to Siegelman. Salimi did not say "soon *we* can free your house too" or "soon *I* can free your house too." Salimi did not signal that she bore any personal responsibility for "free[ing]" Siegelman's house.

The remaining facts center around Siegelman's sale of Unit 1 in 2017 and Salimi's concurrent refinance of Unit 2, in which she took cash out of $115,925.10 and paid $80,000 to Siegelman. The $80,000 payment provides no evidence that Salimi intended to pay the remaining portion of Barber's debt beyond the $80,000. Thus, even if Salimi's payment was made pursuant to a contractual agreement with Siegelman, as opposed to a gift to Barber as Salimi contends, it cannot provide proof that Salimi intended to pay the remaining $35,828 Barber owed Siegelman.

The best fact for Siegelman is that Salimi's $115,925.10 cash out from refinancing Unit 2 is almost the same as the $115,828 Barber owed to

16

Siegelman. But even this does not raise a triable issue of material fact. First, Siegelman never contends that Salimi either paid or even attempted to pay any amount over $80,000 to Siegelman. Second, Siegelman does not dispute that a difference, albeit a small difference, exists between the cash out amount and Barber's remaining debt. Third, Salimi contends that she spent the remaining funds from the finance and did not give any to Barber, which points against any commitment to pay those funds to Siegelman.

In full consideration of the conduct of the parties and the surrounding circumstances, we conclude that Siegelman has failed to present a triable issue of material fact regarding the existence of an implied contract between Siegelman and Salimi.

Siegelman's decision not to allege breach of contract by Salimi in the original complaint against Barber and Salimi, despite alleging breach of partnership agreement by Barber, further confirms that neither Siegelman nor Salimi understood an agreement to have been reached between them regarding the payment of Barber's debts. Only after Barber's debt was discharged through bankruptcy did Siegelman raise a breach of contract claim against Salimi. Siegelman's acts suggest she did not believe she had an implied agreement with Salimi. (See *Southern Pacific Transportation Co. v. Santa Fe Pacific Pipelines, Inc.* (1999) 74 Cal.App.4th 1232, 1242 ["In construing contract terms, the construction given the contract by the acts and conduct of the parties with knowledge of its terms, and before any controversy arises as to its meaning, is relevant on the issue of the parties' intent."].)

The situation here parallels that in *Pacific Bay, supra,* 12 Cal.App.5th 200. There, the defendant had paid a portion of invoices submitted by the plaintiff. (*Id.* at p. 216.) The plaintiff argued that the partial payment

17

evidenced the existence of an implied contract to pay the entire invoiced amounts. (*Ibid.*) The court disagreed, finding that "[t]he fact that [the defendant] only paid for six of the 31 days of treatment undermines [the plaintiff's] claim that the parties ever agreed to the same contractual terms." (*Ibid*.) Instead, "[b]y way of [the defendant's] conduct, it appears that it believed it was to pay for only six days," in contrast to the plaintiff's argument that the defendant should pay for the entire length of treatment. (*Ibid*.) The plaintiff further disputed the rate at which defendant had paid the plaintiff. (*Ibid*.) As a result, the court concluded "we cannot say [the defendant's] payments breached any implied contract because there is no indication in the [complaint] what exactly [the defendant] agreed to pay." (*Ibid*.) It affirmed the trial court's dismissal of the plaintiff's complaint. (*Id.* at p. 217.)

Similarly here, even if Siegelman and Salimi had some sort of understanding that Salimi would assist with Barber's debts (which is not at all evident from the record), we have no evidence that the parties ever agreed to the *same* contractual terms. Their actions point in different directions and therefore "do[ ] not exhibit any mutual intent as to the essential terms of the implied contract." (*Pacific Bay*, *supra*, 12 Cal.App.5th at p. 216; see also *Allied Anesthesia Medical Group, Inc. v. Inland Empire Health Plan* (2022) 80 Cal.App.5th 794, 809 ["The allegations in the [amended complaint], therefore, do not exhibit any mutual consent as to an essential term of the alleged implied contract."].)

We conclude, as the trial court did, that Siegelman has failed to present a triable issue of material fact regarding the existence of an implied contract between her and Salimi.[4]

B.      *Barber Did Not Act as an Agent of Salimi*

Siegelman separately contends that even if Salimi did not impliedly contract to pay Barber's debts, Barber made such a contract on Salimi's behalf in his role as her agent.  We find no merit to this contention.

1.      *The Law of Agency*

"An agent is one who represents another, called the principal, in dealings with third persons."  (§ 2295.)  Agency can be either "actual" or "ostensible."  (§ 2298.)  In actual agency, "the agent is really employed by the principal."  (§ 2299.)  The California Supreme Court in *Malloy v. Fong* (1951) 37 Cal.2d 356, 372, explained the creation of an actual agency:

> "An agency relationship may be informally created.  No particular words are necessary, nor need there be consideration. All that is required is conduct by each party manifesting acceptance of a relationship whereby one of them is to perform work for the other under the latter's direction."

A principal may confer authority on an agent by either "a precedent authorization or a subsequent ratification."  (§ 2307.)  For actual agency to exist, the principal must have the right to control the agent.  (*Edwards v. Freeman* (1949) 34 Cal.2d 589, 592 (*Edwards*) ["In the absence of the essential characteristic of the right of control, there is no true agency[.]"]; Rest.3d Agency, § 1.01 ["Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that

---

[4]      Given our conclusion regarding the absence of mutual assent to the terms of the allegedly implied contract, we do not need to reach Salimi's contention that the alleged contract also lacked adequate consideration.

the agent shall act on the principal's behalf and subject to the principal's control[.]"].)

By contrast, "[a]n agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." (§ 2300.) Ostensible agency focuses on the perspective of a third person, unlike actual agency's focus on the perspective of the agent. (Compare § 2317 ["causes or allows a third person to believe"], with § 2316 ["allows the agent to believe"].) "A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof." (§ 2334.) Thus, three requirements must be met for ostensible authority to bind a principal: (1) an act or neglect of the principal, (2) reasonable reliance thereon by the third party, and (3) change of position or injury resulting from such reliance. (*Ernst v. Searle* (1933) 218 Cal. 233, 237 (*Ernst*); see also *Hill v. Citizens Nat. Trust & Sav. Bk.* (1937) 9 Cal.2d 172, 176 (*Hill*).)

A putative agent's acts or statements on their own "can never establish ostensible authority; there must be some conduct on the part of the alleged principal." (*Asplund v. Selected Investments in Financial Equities, Inc.* (2000) 86 Cal.App.4th 26, 46, fn. 12; accord *Boren v. State Personnel Bd.* (1951) 37 Cal.2d 634, 643; *Petersen v. Securities Settlement Corp.* (1991) 226 Cal.App.3d 1445, 1452 (*Petersen*).) The California Supreme Court has set out the level of care required by a third party alleging the existence of an ostensible agency:

> "A third person . . . is not compelled to deal with an agent, but if he does so, he must take the risk. He takes the risk not only of ascertaining whether the person with whom he is dealing is the agent, but also of ascertaining the scope of his powers. The rule is cogently stated . . . as follows: 'An assumption of authority to act as agent for another of itself challenges inquiry. Like a

20

railroad crossing, it should be in itself a sign of danger and suggest the duty to "stop, look and listen." It is therefore declared to be a fundamental rule, never to be lost sight of and not easily to be overestimated, that persons dealing with an assumed agent, whether the assumed agency be a general or special one, are bound at their peril, if they would hold the principal, to ascertain not only the fact of the agency but the nature and extent of the authority, and in case either is controverted, the burden of proof is upon them to establish it.' " (*Ernst, supra,* 218 Cal. at p. 240.)

The existence of agency is a factual question. (*Secci v. United Independent Taxi Drivers, Inc.* (2017) 8 Cal.App.5th 846, 854.) It may be shown by the parties' conduct, action or inaction on the part of the principal, and the circumstances of the case. (*Vargas v. Ruggiero* (1961) 197 Cal.App.2d 709, 715.) "Only when the essential facts are not in conflict will an agency determination be made as a matter of law." (*Wickham v. Southland Corp.* (1985) 168 Cal.App.3d 49, 55.)

2.      *No Ostensible Agency Existed Between Salimi and Barber*

Siegelman's counsel conceded at oral argument she does not contend Barber served as Salimi's actual agent. Siegelman instead relies on a theory of ostensible agency. As we shall explain, we conclude Siegelman has failed to present a triable issue of material fact to support that theory.

Siegelman has failed to identify an act or neglect of Salimi on which she reasonably relied to believe Barber to be Salimi's agent. (See *Hill, supra*, 9 Cal.2d at p. 176.) Almost all the communications identified by Siegelman occurred between her and Barber. The few communications from Salimi contained no representations that could have reasonably been understood as holding out Barber as her agent. At most, Salimi in a 2011 email asks Siegelman to review the terms of the loan for the purchase of Unit 2 from Barber and signs off "Ellie & Dave." The email says nothing about Salimi delegating Barber to represent her with Siegelman moving forward. Given

21

Siegelman's knowledge about the ongoing companionship of Salimi and Barber, their joint residence in Unit 2, and the contemplated sale of Unit 2 between them, Siegelman could not have reasonably understood the email's references to "us" and "Ellie & Dave" as referring to a different, agency-based relationship. Even where two parties are spouses, the courts will not " 'impl[y] from the marriage relation alone' " the "power to contractually bind each other in the agency context." (*Flores v. Evergreen at San Diego, LLC* (2007) 148 Cal.App.4th 581, 589.) This principle of not implying agency powers applies with even greater effect here, where Salimi and Barber were merely cohabiting without any marriage relationship.

Given the limited communications from Salimi, Siegelman focuses on communications from Barber to attempt to establish an ostensible agency. But ostensible authority " 'must be based *upon acts or declarations of the principal* and not the conduct or representations of the alleged agent.' " (*Petersen, supra,* 226 Cal.App.3d at p. 1452.) Accordingly, Siegelman cannot rely on Barber's representations alone. She instead must identify some act or neglect of Salimi. We conclude that she has failed to do so. Siegelman has identified no communications from Salimi, or even from Barber, in which either of them represents that Barber is Salimi's agent.

Outside of the minimal communications from Salimi, Siegelman points to Salimi's allegedly "ratifying" acts of refinancing Unit 2 and transferring $80,000 to Siegelman. But both of those acts occurred after the alleged contractual negotiations between Siegelman and Barber (as Salimi's putative agent) that form the basis for Siegelman's claim for breach of contract. Siegelman cannot have reasonably understood Barber to be Salimi's agent based on actions that occurred after the alleged contract was entered.

22

Nor has Siegelman identified neglect from Salimi that could have reasonably caused Siegelman to understand Barber to be Salimi's agent. In considering the evidence, we are mindful of the guidance in *Ernst*, *supra*, 218 Cal. at page 240, that if a person chooses to deal with an assumed agent, they " 'are bound at their peril, if they would hold the principal, to ascertain not only the fact of the agency but the nature and extent of the authority.' " None of the communications from Salimi cited by Siegelman evidence any neglect by Salimi. Of the remaining communications on which Salimi was copied, none of them indicate a neglect on Salimi's part that would allow for a reasonable assumption that Barber serves as Salimi's agent. Nowhere in those communications does Siegelman refer to Barber as Salimi's agent or otherwise acting on her behalf. Indeed, in one of the email chains on which Salimi was copied, Siegelman directs her comments to Barber and Salimi separately. She tells Barber, "I would prefer you to pay in full Dave [Barber]. I am owed that much trust." She later tells Salimi, "Ellie if you have the money under your control please deposit directly into my checking account."

None of Siegelman's communications indicate that she believed, reasonably or otherwise, Barber to be Salimi's agent. Nor should she have. The information presented by Siegelman generally shows Salimi's lack of control over Barber, her putative agent. As noted above, a core feature of an agency relationship is that the principal has the right to control the agent. (*Edwards*, *supra*, 34 Cal.2d at p. 592.) The record indicates the opposite, namely Barber exercising control over Salimi to satisfy his debts to Siegelman. Salimi loaned Barber money to help him complete Unit 2. Barber then sold Unit 2 to Salimi to get funds to pay off a portion of his debts to Siegelman. Salimi later paid off Barber's credit card debt to remove an associated lien attached to Unit 2. Finally, when Siegelman put pressure on

23

Barber to pay off his remaining debts, Salimi refinanced the mortgage on Unit 2, taking sufficient cash out to cover Barber's remaining debts. She ultimately paid $80,000 to Siegelman, which covered more than half of Barber's remaining debts. None of these acts looks like Barber working as a fiduciary on Salimi's behalf, as would be required of an agent. (See Rest.3d Agency, § 1.01.) Instead, Salimi consistently acted in Barber's best interests. This occurred even where Barber's interests opposed her own. Such circumstances further militate against finding a triable issue of material fact regarding Barber serving as an ostensible agent of Salimi.

Even if Siegelman had reasonably relied on an act or neglect of Salimi, Siegelman has failed to allege any change of position or injury resulting from her reliance. (See *Ernst*, *supra*, 218 Cal. at p. 237.) The debt that Siegelman paid off in connection with the sale of Unit 1 in 2017 had encumbered the property long before Salimi's purchase of Unit 2. Siegelman makes no contention that she only sold Unit 1 and paid off the debt because of an understanding that Barber was Salimi's agent. Accordingly, Siegelman has failed to adequately allege all the elements required for an ostensible agency.

Because Siegelman has failed to present a triable issue of material fact on either the existence of an implied contract or an agency relationship between Barber and Salimi, we affirm the trial court's grant of summary judgment on Siegelman's first cause of action for breach of contract.

## III.

### *The Unjust Enrichment Cause of Action*

Siegelman contends the trial court erred by granting summary judgment on the cause of action for unjust enrichment. Siegelman specifically alleges the court committed legal error by finding that any enrichment would not be unjust in the absence of a breach of contract or

24

fraud. To the extent the court made such a finding, we agree with Siegelman. Indeed, the existence of a binding contract can preclude the assertion of an unjust enrichment claim. (*Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1388 (*Klein*) [holding that unjust enrichment may not be alleged in the alternative to breach of contract if plaintiff does not dispute the existence of enforceable contracts].) An enforceable contract and corresponding breach therefore cannot be necessary for unjust enrichment.

Siegelman further alleges that triable issues of material fact exist regarding whether Salimi was enriched and whether that enrichment was unjust. We agree the record before us presents triable issues of material fact on these questions. Accordingly, we reverse the trial court's grant of summary judgment on Siegelman's unjust enrichment claim and remand for further proceedings consistent with the analysis that follows.

A.      *The Law of Unjust Enrichment*

A common law claim for unjust enrichment "is essentially an action for restitution." (*Cruz v. PacifiCare Health Systems, Inc.* (2003) 30 Cal.4th 303, 320; accord *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1370 (*Durell*) ["Unjust enrichment is synonymous with restitution."].) More specifically, "[a]n individual is required to make restitution if he or she is unjustly enriched at the expense of another." (*First Nationwide Savings v. Perry* (1992) 11 Cal.App.4th 1657, 1662.) "The elements of a cause of action for unjust enrichment are simply stated as 'receipt of a benefit and unjust retention of the benefit at the expense of another.' " (*Professional Tax Appeal v. Kennedy-Wilson Holdings, Inc.* (2018) 29 Cal.App.5th 230, 238 (*Kennedy*).) The received benefit need not be a direct transfer of value; rather, "[a] saved expenditure or a discharged obligation is no less beneficial to the recipient." (*Ibid.*)

The Restatement Third of Restitution and Unjust Enrichment (Restatement Third) explains that "[l]iability in restitution derives from the receipt of a benefit whose retention without payment would result in the unjust enrichment of the defendant at the expense of the claimant." (Rest.3d Restitution and Unjust Enrichment, § 1, com. a, p. 3.) The Restatement Third notes the "inherent flexibility of the concept of unjust enrichment" and seeks to "classify the circumstances in which a liability in restitution will predictably be imposed." (*Id.* at p. 4.)

Section 23 of the Restatement Third identifies "Performance of a Joint Obligation" as one circumstance involving unjust enrichment.[5] (Boldface omitted.) It provides:

"(1) If the claimant renders to a third person a performance for which claimant and defendant are jointly and severally liable, the claimant is entitled to restitution from the defendant as necessary to prevent unjust enrichment.

"(2) There is unjust enrichment in such a case to the extent that [¶] (a) the effect of the claimant's intervention is to reduce an enforceable obligation of the defendant to the third person, and [¶] (b) as between the claimant and the defendant, the obligation discharged (or the part thereof for which the claimant seeks restitution) was primarily the responsibility of the defendant." (*Ibid.,* boldface omitted.)

The comments to section 23 of the Restatement Third further explain that this provision covers situations not governed by express contract where one party ("A") discharges a common liability of it and another party ("B") so that

---

5    The court in *Kennedy, supra,* 29 Cal.App.5th at pp. 239–241, relied on section 25 of the Restatement Third over the objection of the defendants in that case. The court explained that "California courts have long relied on the American Law Institute's Restatements for guidance" because "California law on unjust enrichment is not narrowly and rigidly limited to quasi-contract principles." (*Kennedy,* at p. 240.)

26

"A has to [at least some] extent performed B's obligation." (Rest.3d Restitution and Unjust Enrichment, § 23, com. a, p. 328.) This "gives A a prima facie claim in restitution to the extent of B's unjust enrichment." (*Ibid.*) The Restatement Third terms this "contribution" when one party has paid more than its share of a common liability "allocated in some proportion" between the two parties. (*Ibid.*)

Section 1432 comports with the Restatement Third's approach to contribution. It provides that "a party to a joint, or joint and several obligation, who satisfies more than his share of the claim against all, may require a proportionate contribution from all the parties joined with him." (§ 1432.) Courts applying section 1432 have termed this right "equitable contribution." (*Morgan Creek Residential v. Kemp* (2007) 153 Cal.App.4th 675, 683–684.) It "does not arise from contract, but rests upon principles of equity and natural justice." (*Blankenhorn-Hunter-Dulin Co. v. Thayer* (1926) 199 Cal. 90, 96 (*Blankenhorn*).)

Regarding the "proportionate contribution" required by section 1432, the California Supreme Court in *Tucker v. Nicholson* (1938) 12 Cal.2d 427, 433 (*Tucker*), dealt with real property that had been purchased jointly by 10 persons, two of whom had a one-sixth interest in the property, and the remaining eight of whom had a one-twelfth interest in the property. A mortgage foreclosure sale of the property at issue in that case resulted in a deficiency judgment that three of the purchasers had paid in full. (*Id.* at p. 429.) Those three purchasers sought contribution from the other purchasers that had not paid. (*Ibid.*) The court held that "[i]n an action against one co-obligor for contribution[,] he may not be held for more than his just proportion of the debt in the absence of a showing of insolvency of the

27

other co-obligors." (*Id.* at p. 433.) It further held that liability of such co-obligors "is presumptively proportionate to their interest in the land." (*Ibid.*)

Although Salimi contends that California does not have a cause of action for unjust enrichment, she does not argue this defeats Siegelman's claim. This court has indeed held that unjust enrichment does not exist as a cause of action in California. (*Durell, supra*, 183 Cal.App.4th at p. 1370.) Instead, "[u]njust enrichment is synonymous with restitution." (*Ibid.*) Unjust enrichment "is not, strictly speaking, a theory of recovery, ' "but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so." ' " (*Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1132.) California courts have shown a consistent willingness to evaluate claims for restitution on the merits even when labeled as causes of action for "unjust enrichment." (See, e.g., *Durell*, at pp. 1370–1371; *Levine v. Blue Shield of California* (2010) 189 Cal.App.4th 1117, 1138; *McBride v. Boughton* (2004) 123 Cal.App.4th 379, 388 [construing "purported cause of action for unjust enrichment as an attempt to plead a cause of action giving rise to a right of restitution"].) We do not deviate from that approach here.

B. *Unjust Enrichment Does Not, as a Matter of Law, Require Breach of Contract or Fraud*

The trial court found that Siegelman's third cause of action for unjust enrichment was "predicated on a breach of an oral contract and fraud." It then concluded "there was no oral contract [for Salimi] to pay for the debts of Barber and as there is an absence of fraud, any enrichment would not be unjust." Siegelman claims the court erred in requiring fraud or breach of contract, as a matter of law, for any enrichment of Salimi to be unjust. We do not read the court's ruling as making such a clear declaration regarding the scope of unjust enrichment. But to the extent the court intended to make

28

such a declaration, we agree with Siegelman that an unjust enrichment claim cannot be so constrained.

As we have explained, a claim for equitable contribution arises under section 1432, which does not impose any requirement of contractual breach or fraud. It only requires a party to have satisfied more than her share of a joint and several obligation to a third party. (§ 1432.) In other words, while the co-obligors must have a contractual or other obligation to a third party, there is no requirement that the co-obligors must have an agreement amongst themselves governing contribution toward the joint obligation. (See *ibid.*) Indeed, the Restatement Third's counterpart to section 1432 explains that where the "rights and duties between multiple obligors [are] fixed by contract[,] . . . a claim to . . . contribution is governed by the parties' agreement, not by the law of restitution." (Rest.3d Restitution and Unjust Enrichment, § 23, com. a, p. 329.) This court has more generally stated "as a matter of law, a quasi-contract action for unjust enrichment does not lie where . . . express binding agreements exist and define the parties' rights." (*California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 172; see also *Klein*, *supra*, 202 Cal.App.4th at p. 1389 [" 'When parties have an actual contract covering a subject, a court cannot— not even under the guise of equity jurisprudence—substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract.' "].) Thus, the existence of an enforceable contract between co-obligors would bar a claim for equitable contribution, as opposed to enabling such a claim.

Section 1432 also does not require the existence of fraud to make a claim for equitable contribution. Fraud may form the basis for certain unjust enrichment claims. (See, e.g., Rest.3d Restitution and Unjust Enrichment,

§ 13.)  However, fraud does not appear at all in the Restatement Third's provision covering equitable contribution.  (See *id.*, § 23.)  Nor is fraud discussed in any of the commentary to that provision.  (See *id.*, coms. a–g, pp. 328–339.)  This absence is unsurprising, given that a claim for equitable contribution arises when "one has in effect paid the other's debt—not intending to make a gift, and without being compensated for doing so." (*Id.*, com. b, p. 331.)  Such a claim does not depend on wrongdoing by the party whose debt was paid.  It merely requires the satisfaction or reduction of another's obligation.

We therefore conclude neither breach of contract nor fraud are required, as a matter of law, for a claim of unjust enrichment, at least where such claim seeks equitable contribution for satisfaction of a debt for which multiple persons are jointly and severally liable.

C.     *At Least One Triable Issue of Material Fact Exists*

The trial court found "no actual controversy" on the third cause of action for unjust enrichment because it was "predicated on a breach of an oral contract" that the court had found did not exist.  So it did not consider whether there are triable issues of fact as to the unjust enrichment claim. Given that a breach of contract is not necessary (and sometimes precludes) a claim for unjust enrichment, we must determine whether Siegelman identified one or more triable issues of material fact that prevent entry of summary judgment in Salimi's favor.

Siegelman contends she has presented evidence sufficient to show that Salimi was enriched by Siegelman's payment of the remaining debt used to generate funds to build Unit 2.  She alleges the debt encumbered both Unit 1 and Unit 2.  As a result, Siegelman argues her payment of the debt discharged an obligation that Salimi would otherwise have had to pay.  We

30

conclude Siegelman has presented a triable issue of material fact on this point.

As noted above, section 1432 allows equitable contribution where a party satisfies more than her share of a joint and several obligation. The record before us presents the unresolved factual question of whether the remaining debt encumbered Unit 2 at the time Siegelman paid it off. Siegelman and Barber originally took title to the undivided property (bearing parcel number 448-272-34) as tenants in common, per the April 15, 2002 grant deed. They agreed on a split in ownership where Siegelman would own two-thirds of the property and Barber would own the remaining one-third.

After recording a condominium plan for the property, Siegelman and Barber decided to refinance to generate funds for the construction of Unit 2. To obtain owner-occupied financing rates, they decided to shift title ownership entirely to Barber. Siegelman executed a deed on October 23, 2006 that granted her interest to Barber. That deed seems to indicate but does not clearly specify whether the exclusion of "all units as shown on the condominium plan" (aside from specifically included Unit 1 and Unit 1A) applies to Unit 2, which had not yet been built. If it does exclude Unit 2, this deed would have left Barber as the recorded owner of the entirety of the property, except for Siegelman's half interest in the yet-to-be-constructed Unit 2.

Following the transfer from Siegelman, Barber executed a deed of trust with Washington Mutual Bank on November 3, 2006. That deed of trust identified the parcel number as "448-272-34" without the "-02" appended in later deeds applicable only to Unit 2. Separate from the parcel number, the description of the property matches that used on the October 23, 2006 deed from Siegelman to Barber. That description has the same lack of clear

specification regarding whether it excludes the yet-to-be-constructed Unit 2. The deed of trust separately states that it covers "all the improvements now or hereafter erected on the property," including "[a]ll replacements and additions."

Siegelman contends that the November 3, 2006 deed of trust encumbered both Unit 1 and Unit 2 until she paid off the remainder of the debt in 2017 as part of selling Unit 1. In support of her position, Siegelman points to a September 17, 2020 declaration from Barber in which he states:

> "I always understood and still understand that the original loan and refinanced loan was based on the original configuration of the property (prior to any construction) and stayed with the property until the sale of 4883 in 2017. You could look at it as two-thirds of the original loan was for 4883 and the remaining one-third was in essence for the land under 4885 and a garage."

However, the 2008 agreement between Siegelman and Barber states "4883 Narragansett [Unit 1] is the sole collateral" for the 2006 refinance, while "4885 Narragansett [Unit 2] is free and clear." Siegelman contends that the agreement between her and Barber is incorrect on this point. As a result, Siegelman contends that Salimi was enriched by the removal of the debt obligation attached to Unit 2.

The trial court did not address this issue in either its October 1, 2021 minute order or October 19, 2021 judgment. Nor did Salimi address Siegelman's contention in her briefing on appeal. Based on the record and briefing before us, we cannot determine whether the November 3, 2006 deed of trust encumbered Unit 2. Siegelman has therefore presented a triable issue of material fact on the unjust enrichment claim. Consequently, we reverse the court's grant of summary judgment to Salimi on the unjust enrichment cause of action.

D.    *Guidance on Remand*

On remand, the trial court must determine whether Unit 2 was encumbered by the refinanced debt also secured by Unit 1. If not, Siegelman's unjust enrichment claim fails. If Unit 2 was encumbered, the court must next determine whether Salimi, as owner of Unit 2, and Siegelman, as owner of Unit 1, were jointly and severally obligated under section 1432 to pay the debt secured by their property. If not, the court should consider whether restitution is appropriate under any other theory, including, for example, under section 24 of the Restatement Third, which differs from section 23 by covering independent (not joint and several) duties owed to third parties.

If Siegelman and Salimi were jointly and severally liable for debt encumbering the two units following the transfer of Unit 2 to Salimi, the trial court must determine whether Siegelman satisfied more than her share of the debt. In so doing, the court should follow "principles of equity and natural justice," from which the right of contribution arises. (*Blankenhorn*, *supra*, 199 Cal. at p. 96; accord *Jans v. Nelson* (2000) 83 Cal.App.4th 848, 855.) The court in *Tucker*, *supra*, 12 Cal.2d at page 433, relied on the relative ownership of the underlying property in considering how to apportion a mortgage deficiency judgment among the purchasers. (See also *Jans*, at p. 856 ["Solvent joint debtors primarily liable on a debt are routinely held equitably liable for contribution in proportion to their ownership interest, in the absence of a showing of an agreement to the contrary."].)

Here, no agreement exists between Siegelman and Salimi regarding their relative ownership of the previously undivided property. The "Agreement as to 4883 and 4885 Narragansett" (capitalization omitted) entered between Siegelman and Barber purports to memorialize the partners

33

as having a "66.667%" interest and "33.333%" interest in the property, respectively. However, it is unclear whether the construction of Unit 2 caused any shift in the share of ownership between Siegelman and Barber prior to the sale of Unit 2 to Salimi. The June 24, 2011 deed that transferred Unit 2 to Salimi describes the property as including "an undivided one-half (1/2) interest in and to Parcel 1" (*i.e.*, the underlying real property). However, it also describes the transferred property as including "Unit 2" without any similar apportionment amongst all the units on the underlying real property, which include at least "Unit 1 and Unit 1A." (Capitalization omitted.)

We provide this discussion merely as potential guidance for the trial court on remand. We leave to the court, following principles of equity and natural justice, the determination of what proportionate contribution, if any, is required from Salimi.

## DISPOSITION

The judgment is reversed as to the third cause of action for unjust enrichment. The case is remanded for the trial court to conduct further proceedings consistent with this opinion on that cause of action. In all other

respects, the judgment is affirmed.  Each party shall bear its own costs on appeal.


DO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


DATO, J.